## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CHESTER COLEMAN**                                          **CIVIL ACTION**

**VERSUS**                                                   **NO:    07-3624[1]**

**SECRETARY OF THE DEPARTMENT OF**                           **SECTION: "R" (4)**
**HEALTH AND HUMAN RESOURCES**

### REPORT AND RECOMMENDATION

Before the Court is the **Motion for Summary Judgment (Rec. Doc. No. 13)** filed by the plaintiff, Chester Coleman, pursuant to Title 42 U.S.C. §405g, seeking judicial review of a final decision of the Commissioner of Social Security because it is not based upon substantial evidence.[2] The Commissioner denied Coleman's application for Disability Insurance Benefits filed pursuant to the Social Security Act, Title 42 U.S.C. § 1382, *et seq.*

The Commissioner filed a **Defendant's Cross-Motion for Summary Judgment (Rec. Doc. No. 14)** on behalf of the Social Security Administration contending that it is entitled to judgment as a matter of law because the decision of the Administrative Law Judge ("ALJ") to end Coleman's disability benefits was based upon substantial evidence.

---

[1] Coleman's first appeal from the decision of the Social Security Administration was considered by this Court in Civil Action Number 02-0001.

[2] The functions of the Secretary of Health and Human Services in Social Security cases were transferred to the Commissioner of Social Security effective March 31, 1995, pursuant to Public Law No. 103-296, the Social Security Independence and Program Improvement Act of 1994.

The matter and the cross-motion for summary judgment were referred to the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(b) and Uniform Louisiana Local Rule 19.02E(b) for the submission of proposed Findings and Recommendations.

## I.      Factual and Procedural Summary

Coleman filed the subject complaint seeking a review of the denial of his claim for Social Security Disability Insurance Benefits.  Coleman alleges that he is disabled as a result of a herniated lumbar disc, reflex sympathetic dystrophy[3] of the right wrist, a history of hypertension, and chronic colitis.[4]  The Social Security Administration originally determined that Coleman was disabled as of April 16, 1990.  Seven years later, the agency concluded that his disabilities subsided renderring him no longer eligible for disability benefits.

This matter was initially submitted to the Court for review in 2002.[5]  In that appeal, both the Commissioner and Coleman moved for remand alleging that the hypothetical scenario submitted to the vocational expert ("VE") was defective.  The undersigned therefore recommended that the matter be remanded and that the ALJ be directed to conduct another hearing to reassess Coleman's residual functional capacity and the impact that the physical limitations had on the available occupational base.  The District Court adopted the findings and ordered the remand.

On remand, the ALJ held two hearings after which he again denied Coleman disability benefits.  At the end of the first  hearing, the ALJ left the record open to obtain and consider a neurological consultative examination and the submission of updated medical records.  At the

---

[3]Reflex sympathetic dystrophy consists of a series of changes caused by the sympathetic nervous system, marked by pallor or rubor , pain, sweating, edema or osteoporosis, following muscle strain , bone fracture, or injury to nerves or blood vessels.  *See Dorland's Illustrated Medical Dictionary*, p. 520-21 (28th ed. 1994).

[4]Colitis is an inflammation of the colon. *Id.* at 352.

[5]*See* Civil Action No. 02-0001.

supplemental hearing held on January 25, 2005, the ALJ announced that he would be issuing a favorable decision.  (Tr. 553-562).  However, the ALJ's written opinion concluded to the contrary, finding that the vocational and testimonial evidence indicated that Coleman was not entitled to disability benefits.  (Tr. 553).

The ALJ found that at the time of the Comparison Point Decision, which was rendered in 1993, Coleman had medically determinable impairments consisting of a herniated lumbar disc, a right wrist injury that required two surgeries with a fusion which resulted in the development of reflex sympathetic dystrophy of the right hand, a history of hypertension, and chronic colitis. (Finding 2, Tr. 555).  The ALJ further found that, through July 1, 1997, Coleman had not engaged in substantial gainful activity.  (Finding 3, Tr. 555).  He resolved that the medical evidence establishes that, as of July 1, 1997, Coleman had the following medically determinable impairments: a history of right wrist injury which required two surgeries including fusion and from which he developed reflex sympathetic dystrophy of the right hand; right shoulder adhesive capsulitis/rotator cuff tendinitis; insulin dependent diabetes mellitus; hypertension; acid reflux; cervical degenerative disc disease; and vertebral disc displacement with moderate spondylosis. (Finding 4, Tr. 555).

The ALJ also concluded that, as of July 1, 1997, Coleman did not have an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  (Finding 5, Tr. 555).  The ALJ also found that, after considering the impairments individually and in combination  as presented in July 1997, they did not meet a listing level.  He indicated further that he gave consideration to the musculoskeletal, neurological, endocrine, and cardiovascular listings.  (Finding 5, Tr. 556).

The ALJ also found that, as of July 1, 1997, Coleman's impairments decreased in severity and went from "less than sedentary" to a "limited range of light work."  (Finding 6, Tr. 556).  The

3

ALJ concluded that Coleman had the residual functional capacity to do the following:  lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for at least two hours but no more than three hours in an eight hour workday; and Coleman must be able to periodically alternate sitting and standing every 45 minutes to an hour.  (Finding 7, Tr. 556).

He also found that Coleman could perform limited pushing and pulling with the right upper extremity, yet he could not perform overhead activities with the right upper extremity but could do so with the left upper extremity.  (Finding 7, Tr. 556).  He found that Coleman could perform  only occasional gross manipulation with the right hand and wrist and that he should avoid exposure to vibration, hazardous machinery, and unprotected heights.  (Finding 7, Tr. 556).  The ALJ concluded that Coleman's medical improvement was related to his ability to work because the improvement resulted in an increase in his residual functional capacity.  (Finding 8, Tr. 560).

The ALJ concluded from the record that, as of July 1, 1997, Coleman's impairments were severe, that Coleman worked in the distant past as a bargeman for a grain elevator and that he had not engaged in gainful activity for the past 15 years such that he had no history of relevant work.  (Finding 9, 10, Tr. 560).  He also noted that because Coleman was 44-years-old on July 1, 1997, he was considered a younger individual between ages 18-44.  (Finding 11, Tr. 560).

 The ALJ mentioned that Coleman had a marginal education, having completed the sixth grade, but that he was able to communicate in English and was marginally literate.  (Finding 12, Tr. 560).  Finally, he found that transferability of skills was not an issue but that given his age, education, work experience, and residual functional capacity, Coleman was able to perform a significant number of jobs in the national economy.  (Finding 14, Page 561).

The ALJ determined that, as of July 1, 1997, Coleman was capable of making a successful adjustment to work that existed in significant numbers in the national economy.  (Tr. 561).  The ALJ

further found that Coleman's abilities to perform all or substantially all of the requirements of light work had been impeded by additional limitations.  He then relied upon the VE to determine the extent of the erosion of the unskilled, light occupational base caused by these limitations.  (Tr. 561).

The VE testified that Coleman would be able to perform the requirements of the following jobs:  (1) an unarmed security guard/surveillance, 8,751 jobs, which would have to be reduced by 75%  to 2,187.75 based on Coleman's limitations; (2) light cashier, 20,149 jobs, which would be reduced by 50% to 10, 074.50 based on Coleman's limitations; (3) sedentary cashiering jobs of 12,822, reduced by 50% to 6,411 jobs based on Coleman's limitations; (4) sedentary inspector or sampler, 505 jobs, reduced by 50% to 252.50 jobs; (5) information clerk, 4,693 jobs, reduced by 50% to 2,346.50 jobs if in the light category, and from 1,273 jobs reduced by 50% to 636.50 if in the sedentary category; (6) parking lot attendant, 331 jobs reduced by 50% to 165.50 jobs based upon Coleman's limitations.  (Tr. 561).  Based on this, the ALJ concluded that, as of July 1, 1997, Coleman was capable of making a successful adjustment to work that existed in significant numbers in the national economy directing a finding of not-disabled.

## II.    Standards of Review

### A.    Judicial Review

The role of this Court on judicial review under Title 42 U.S.C. § 405(g) is limited to determining whether (1) the final decision is supported by substantial evidence and (2) whether the Commissioner applied the proper legal standards when evaluating the evidence.  *See Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).  The Court may not re-weigh the evidence, try issues *de novo,* or substitute its judgment for that of the Commissioner.  *Allen v. Schweiker*, 642 F.2d 799, 800 (5th

Cir. 1981).  If supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed.  *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989).

"Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.  It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater,* 67 F.3d 552, 555 (5th Cir. 1995); *see Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It must do more than create a suspicion of the existence of the fact to be established, but a lack of "substantial evidence" will be found only where there is a "conspicuous absence of credible choices" or "contrary medical evidence." *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973); *Hemphill v. Weinberger*, 483 F.2d 1137, 1138 (5th Cir. 1973).

However, a single piece of evidence will not satisfy the substantiality test if the ALJ ignores, or fails to resolve, a conflict created by countervailing evidence.  Evidence is not substantial if it is overwhelmed by other evidence, particularly evidence offered by treating physicians.  *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

Finally, the Court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnosis and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) his age, education, and work history." *Hendricks v. Apfel*, No. 99-1212, 2000 WL 174884, at *3 (E.D. La. Feb. 14, 2000) (*citing Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995)).

The concept of disability is defined in the Social Security Act as the "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted  . . . for a constructive period of not less than twelve months."  42 U.S.C. §§416(i)(1), 423(d)(1)(A).  Section 423(d)(3) of the Act further defines "physical or mental impairment" as "an impairment that results from anatomical, physiological or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *See* 42 U.S.C. § 423(d)(3).

### B.      Cessation of Benefits

When the cessation of benefits is at issue, as here, the central question is whether the claimant's medical impairments have improved to the point where he is able to perform substantial gainful activity.  42 U.S.C. § 423(f)(1).  Improvement is measured from "the most recent favorable decision" that the claimant was disabled.  20 C.F.R. § 416.994(b)(1)(I).  There is no presumption of continuing disability.  *Cutlip v. Sec. of Health and Human Servs.*, 25 F.3d 284, 286-287 n.1 (6th Cir. 1994).  Instead, the Commissioner applies the procedures that are outlined in 20  C.F.R. §§ 404.1594 and 416.994 to determine whether a claimant's disability has ended and that he is now able to work.  Benefits may be continued at any point if it is determined that the claimant is still unable to engage in substantial gainful activity.

The Regulations provide seven specific steps for the ALJ to follow in reviewing the question of whether disability benefits are to continue.  20 C.F.R. § 416.994(h)(5).

1.      Does claimant have an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1, Subpart P of part 404 of chapter 994?  If yes, disability continues.

2.      Has there been medical improvement? If yes, go to step 3; if no, go to step 4.

3.      Is the medical improvement related to the claimant's ability to work?  In other words, has there been an increase in the residual functional capacity (RFC) based on the impairment(s) present at the time of the most recent favorable medical determination?  If no, go to step 4; if yes, go to step 5.

4.      If there has been no medical improvement, or if any improvement is not related to the ability to work, do exceptions to the medical improvement standard apply? If group two exceptions (§ 416.994(b)(4)) apply, disability has ended.  If group one exceptions apply (§ 416.994(b)(3)) apply, go to step 5.

5.  If medical improvement is shown to be related to the ability to work or group one exceptions apply, does the individual have an impairment or combination of impairments which is severe?  If no, disability has ended.  If yes, go to step 6.

6.  If the claimant's impairment(s) is severe, what is the claimant's current ability to do substantial gainful activity?  Can the individual do her past relevant work?  If yes, disability has ended.  If no, go to step 7.

7.  Given the residual functional capacity assessment and considering claimant's age, education, and past work experience, can the claimant do other work [that exists in significant numbers in the economy]?  If yes, disability has ended.  If no, disability will be found to continue.

## III.   Analysis

### A.   Credibility Determination

Coleman contends that, in declining to find him credible, the ALJ ignored much of the testimony and mis-stated Coleman's testimony regarding his ability to drive.  Coleman argues that the ALJ then used the mis-stated testimony as basis for denying him benefits.  Consequently, Coleman argues that the ALJ cessation of benefits was not based upon substantial evidence.

The Commissioner does not specifically address the issue of the accuracy of the facts relied upon in assessing Coleman's credibility.  The Commissioner generally contends that the finding of disability cessation is supported by the evidence of record.

An ALJ has discretion to judge a claimant's credibility and must evaluate subjective complaints in light of the objective medical evidence on record.  *Foster v. Astrue*, 277 Fed. Appx. 462 (5th Cir. May 08, 2008).  Credibility determinations are generally entitled to great deference. *Newton v. Apfel,* 209 F.3d 448, 459 (5th Cir. 2000); *see Gonzales v. Astrue*, 231 Fed. Appx. 322 (5th Cir. May 15, 2007) (adverse credibility determination made by an ALJ with respect to claimant seeking social security disability benefits was supported by inconsistencies in claimant's testimony and between claimant's testimony and documentary evidence).

While credibility issues are for the Commissioner and not the courts to resolve, *Martinez,* 64 F.3d at 172, a credibility determination based entirely on mistaken facts is not supported by substantial evidence and is subject to reversal by this Court. *See Ripley,* 67 F.3d at 555 (noting that an ALJ's findings of fact must by supported by substantial evidence); *see also*, 42 U.S.C. §§ 405(g), 1383(c)(3) (same).

The record shows that the ALJ found that Coleman's statements concerning the intensity, duration, and limiting effects of his symptoms were only credible to the extent that they support the limitations set forth in the residual functional capacity. The ALJ quoted Coleman as having told the occupational therapist, Laura Fuhrman, that he only drove when necessary. He concluded that this statement was contrary to Coleman's testimony at the benefits hearing, where the ALJ recalled that Coleman did not qualify or limit his ability to drive. (Tr. 558).

It is true that this is an inaccurate assessment of what Coleman actually testified. The transcript confirms that Coleman testified that he needed assistance with transportation and that most of the time either his wife or daughter would drive him to different locations. Coleman testified that he did not trust himself to drive because of the medication he takes. (Tr. 794). Coleman further clarified that he only drives when he has to, but that his vision was blurred and he sees flashes in his eyes. (Tr. 795).

However, this misstatement by the ALJ does not constitute the totality of facts he considered when assessing Coleman's credibility. The ALJ further concluded that based upon the findings of Drs. Applebaum and Tamimie there was evidence in the record that Coleman was exaggerating his symptoms. (Tr. 556). In assessing Coleman's testimony, the ALJ also noted that Dr. Tamimie found during his examination that there was no evidence of swelling, spasm, ecchymosis, or bruising

of the neck or back.  Dr. Tamimie, according to the ALJ, noted that there were inconsistent pain responses which was suggestive of malingering.  (Tr. 558).

He also referred to Dr. Applebaum's 1997 opinion that Coleman was malingering or exaggerating his symptoms.  According to the ALJ, Dr. Applebaum found that Coleman did not have disease or damage involving the spinal cord or nerve roots.  (Tr. 558).

Considering the additional reasons given by the ALJ, the Court finds that the credibility determination was not based on "totally misstated facts" as Coleman suggests.  Therefore, the Court finds that the ALJ sufficiently supported his credibility assessment by references to the record such that they are entitled to judicial deference.  *Villa v. Sullivan* 895 F.2d 1019, 1022, 1024 (5th Cir. 1990).

### B.    Controlling Opinions of the Treating Physicians

Coleman  contends that the ALJ inappropriately disregarded the treating physician findings and instead relied solely upon the expert for the worker's compensation carrier, Dr. Applebaum, who "only reviewed records and not actual diagnostic film" in connection with prior litigation.[6]  Coleman contends that the ALJ also relied heavily on the consult opinion of Dr. Gaines and that of Dr. Tamimie, who was also hired by the worker's compensation carrier in this prior litigation.  Coleman urges that none of these doctors were his treating physicians.  Coleman contends that, according to his treating physician, Dr. Adatto, he has a herniated disc in his back, with an indication for surgery, along with a fused right wrist with reflex sympathetic dystrophy.

The Commissioner contends that the ALJ properly evaluated the medical evidence.  The Commissioner contends that the ALJ appropriately rejected the findings of the treating physicians. He argues that, although the ALJ did not reference in detail the factors set forth in 20 C.F.R. §

---

[6]Rec. Doc. No. 13, Memorandum in Support of Motion for Summary Judgment, p. 7.

416.927(d), he addressed the relevant factors in the opinion, which is based upon substantial evidence.

Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweike*, 653 F.2d 997, 1001 (5th Cir. 1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir.1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence.'" *Newton*, 209 F.3d at 455 (quoting *Martinez*, 64 F.3d at 176).

Under the regulations, a treating physician may offer an opinion which reflects a judgment about the nature and severity of the claimant's impairments including the claimant's symptoms, diagnosis and prognosis, and any physical or mental restrictions. *Martinez*, 64 F.3d at 176; 20 C.F.R. § 404.1527(a)(2). The ALJ must give controlling weight to the opinion of a treating physician if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Martinez*, 64 F.3d at 176; 20 C.F.R. § 404.1527(d)(2).

The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists. *Id.* " '[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez*, 64 F.3d at 175 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).

The relevant criteria to consider provides that the ALJ consider (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician. *See* 20 C.F. R § 404.1527.  Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176.

### 1.   **Dr. Adatto**

It is undisputed that Dr. Adatto treated Coleman.  The most recent visit occured in September of 2004.  Upon examination of Coleman, Dr. Adatto found that Coleman had limited motion in the lumbar spine with mild spasm at rest and with stress.  He found that the Trendelenburg test[7] was negative bilaterally.  Further, upon examination he found that Coleman's deep tendon reflexes were equal and active in both lower extremities and that he could heel toe walk unaided.  (Tr. 665).  Dr. Adatto noted symmetrical muscular development and equal leg lengths which were measured from the anterior superior iliac spine to the medial malleoli.  Coleman's pulses were found to be within normal limits.  Dr. Adatto further noted a trigger point of tenderness in the lumbar spine musculature. (Tr. 665).  He diagnosed Coleman with sacroilitis[8] and not a herniated disc.

---

[7]Trendelenburg position is a position of the body for medical examination or operation in which the patient is placed head down on a table inclined at about 45 degrees from the floor with the knees uppermost and the legs hanging over the end of the table.  http://medical.merriam-webster.com/medical/trendelenburg.

[8]Sacroiliitis is an inflammation of the sacroiliac joint. A patient with this disorder can present in a variety of different ways. Often a patient with sacroiliitis will come to their physician with a sudden onset of fever, pain and decreased range of motion. Non-acute patients may or may not present with a fever. Patients are often ill, limping, in pain and showing a decreased range of motion, but the symptoms are still generally vague. http://www.back.com/causes-inflammatory-sacrolitis.html; http://medical.merriam-webster.com/medical/sacroiliitis.

Furthermore, according to the x-rays taken in October 2004, there was some moderate disc space narrowing at the C4-5 level with mild spondylosis present at that level and a spur formation. The doctor further noted that, at the office visit, Coleman presented with a canned drink and was moderately overweight.  (Tr. 665).  Dr. Adatto also noted that Coleman was a chronic pain patient to whom he explained alternatives to narcotic medication and to whom he indicated that his office would not re-issue prescriptions without an office visit.  (Tr. 665).

Dr. Adatto issued a permanent partial impairment disability finding of 10-15% of the lumbar spine.  Dr. Adatto further instructed that Coleman needed to avoid repetitive stooping or bending and repetitive lifting of objects over 10 to 20 pounds.  In addition, he was to avoid prolonged sitting or standing in the same position for more than 45 minutes, plus or minus 15 minutes, without being able to move around and change position.  Dr. Adatto noted that these restrictions would be the same with or without surgery.  (Tr. 666).

According to the ALJ's opinion, he gave great weight to the opinions of both the consultative specialist, Dr. Gaines, and to Dr. Adatto, as the treating orthopedic surgeon.  This is contrary to Coleman's suggestion that the ALJ did not give great weight to Dr. Adatto's opinions.  In fact, a review of the ALJ's opinion indicates that he adopted the restrictions mentioned by Dr. Adatto in the September 24, 2004, medical record.  Thus, contrary to the assertions of Coleman, the ALJ did not reject the treating physician's opinion, but he instead considered them and included them in his findings regarding the extent of Coleman's limitations.  Coleman's arguments to the contrary must be rejected.

## 2.   **Dr. Phillips**

Coleman also contends that the ALJ erred when he failed to give weight to the findings of Dr. Phillips, his long-term treating physician. Coleman asserts that Dr. Phillips treated him in connection with a hotly-contested worker's compensation case. He points out that the only doctors who disagreed with Dr. Phillips's opinions were the physicians hired by the worker's compensation insurance company to review medical reports and who did not see or examine Coleman or the diagnostic images taken of his back or extremities. Coleman argues that the ALJ failed to give appropriate weight to Dr. Phillips's medical diagnosis and finding that Coleman was in fact disabled as a result of his various ailments.

The Commissioner contends that the ALJ appropriately rejected the findings of Dr. Phillips and although he did not detail the factors set forth in 20 C.F.R. § 416.927(d), his opinion is based upon substantial evidence.

Coleman is generally correct that treating physician's opinions should be given great weight. *Martinez*, 64 F.3d at 176 (*citing Greenspan v. Shalala,* 38 F.3d 232, 237 (5th Cir.1994)). The Fifth Circuit, however, has distinguished, between the weight given to a treating physician's medical opinion on the nature and severity of an impairment and his opinion on whether the patient is disabled and cannot work. *Miller v. Barnhart*, 211 Fed. Appx. 303, 305 (5th Cir. Dec. 27, 2006) (*citing Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003)).

In the Fifth Circuit Court, an ALJ is not required to justify a decision to give little weight to a physician's opinion that a patient is disabled or unable to work, because such a decision is reserved for the Commissioner. *Frank*, 326 F.3d at 620. An ALJ need not give special weight to a treating physician's opinion if it has no special significance. "Among the opinions by treating doctors that have no special significance are determinations that an applicant is 'disabled' or 'unable to work.'

14

20 C.F.R. § 404.1527(e)(1).  These determinations are legal conclusions that the regulation describes as 'reserved to the Commissioner.'"  *Id.*

In his opinion, the ALJ noted that Dr. Phillips had been treating Coleman for back pain since 1993.  He noted that Coleman was originally diagnosed with a herniated disc at L4-5 based on a CT scan.  (Tr. 557).  He noted further that Dr. Phillips later changed his diagnosis to a disorder of the sacrum.  (Tr. 557).  Additionally, according to the ALJ, Dr. Phillips noted that Coleman had multiple spine syndrome in both extremities with testing but it did not reveal particular anatomy.  (Tr. 557).

The ALJ also found that Dr. Phillips treated Coleman with steroidal injections and pain medication.  He further noted that Dr. Phillips resolved that Coleman was disabled.  (Tr. 557).  Dr. Phillips according to the ALJ concluded that, in 1997, surgery probably would not have cured his symptoms.  (Tr. 557).  The ALJ correctly noted in his own opinion that the determination of disability was reserved to him as an ALJ.  (Tr. 557).

The Fifth Circuit Court has made clear that an ALJ need not give special weight to conclusions about disability or the ability to work.  The ALJ did not err in that regard.  Even if Dr. Phillips's opinion was supported by substantial evidence, as Coleman stresses, the ALJ was not required to give them special weight in assessing his record.  Thus, contrary to the assertions of Coleman, the ALJ was not require to give great weight to Dr. Phillips's disability opinion.

## C.    **The Denial of Benefits**

The final argument set forth by Coleman is that the ALJ's conclusion that he had the residual functional capacity to perform a limited range of light work for which there were significant  jobs that existed in the national economy was not based upon substantial evidence.  Coleman also challenges the hypotheticals posed to VE because the ALJ did not fully incorporate Coleman's limitations.

Additionally, Coleman contends that the ALJ deceptively secured a record without providing his attorney with the opportunity to cross examination of the VE when he stated on the record after the VE testified that he would issue a favorable finding of disabled. Coleman argues that once the ALJ made that statement, he led counsel to believe that there was no need for cross-examination of the VE. This, Coleman argues, denied him due process and a fair administrative hearing.

The Commissioner contends that the ALJ's determination was supported by the VE and the Dictionary of Occupational Titles ("DOT") guidelines. The Commissioner further contends that the hypotheticals about which Coleman complains incorporated the restrictions and impairments that were supported in the record such that the ALJ's decision is based upon substantial evidence. The Commissioner does not address the issue of the impact of the ALJ's statement regarding Coleman's counsel's ability to make sure the administrative record had additional testimony regarding his clients limitations.

The Medical-Vocational Guidelines ("grids") consist of three tables for sedentary, light, and medium work, which may be consulted once a claimant's residual functional capacity ("RFC") is determined. The grids direct conclusions of disability or non-disability based upon a person's age, education, and previous work experience. *See* 20 C.F.R. §§ 201-03, Pt. 404, Subpt. P, App. 2 (2005).

Where the ALJ properly determines that a claimant's RFC is not significantly diminished by a non-exertional limitation,[9] then the ALJ may rely exclusively upon the grids, and is not required

---

[9] A "non-exertional limitation" is a limitation or restriction which affects a claimant's "ability to meet the demands of jobs other than the strength demands." 20 C.F.R. § 404.1569a(a). Non-exertional limitations include the following: (1) difficulty functioning due to pain; (2) difficulty functioning due to nervousness, anxiety, or depression; (3) difficulty maintaining attention or concentration; (4) difficulty understanding or remembering detailed instructions; (5) difficulty seeing or hearing; (6) difficulty tolerating a physical feature of a certain work setting (such as dust or fumes); or (7) difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching. *See* 20 C.F.R. § 404.1569a(c)(1).

to hear testimony from a VE.  However, the ALJ may not apply the grids, and must hear testimony from a VE, where a claimant's RFC is significantly diminished by a non-exertional limitation.  *See McGeorge v. Barnhart*, 321 F.3d 766, 768-69 (8th Cir. 2003).   There are exceptions to these guidelines.

First, even when a claimant has a non-exertional impairment, the Commissioner may nevertheless rely exclusively on the grids when the ALJ determines that the nonexertional impairment does not significantly affect the claimant's RFC.  *Newton,* 209 F.3d at 458 (*citing Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987)).  Second, even when the RFC is significantly affected by a non-exertional impairment, the Commissioner's regulation permits an ALJ to consult the grids as a framework for considering "how much the individual's work capability is further diminished . . . by the nonexertional limitations."  20 C.F.R. § 200.00(e)(2), pt. 404, subpt. P, app.2 (2005).

The Commissioner issued Social Security Ruling 83-14 to clarify use of grid rules as a framework for disability determinations involving claimants with both exertional and non-exertional impairments.  Essentially, the Ruling directs adjudicators to first ascertain whether the grids direct a finding of disability based on the claimant's strength or exertional limitations alone.  If so, the claimant's eligibility would be established.  Soc. Sec. R. 83-14 (1983), 1983 WL 31254, at 3.  If not, the ALJ should:

- consider requirements of jobs which the claimant might perform with the strength limitations,

- determine whether the claimants' nonexertional limitations affect performance of those jobs, and if so,

- determine to what extent the available "occupational base" is eroded by the non-exertional limitations.

*Id.*, at 6.

For the latter determination, the Ruling directs ALJ's to take administrative notice of job information in "publications listed in sections 404.1566 and 416.966 of the regulations" for "simple issues."[10]  *Id.*, at 4.  When more complex issues are involved, the ALJ may enlist "the assistance of a vocational resource."  The Ruling provides a step-by-step analytical template.[11]  Finally, the Ruling requires that in all decisions, "[t]here must be findings of fact and recitation of the evidence which supports each finding."  *Id.*, at 6.

In this case, due to the complexity of the issues involved, the ALJ sought the opinion of a vocational expert and proposed several hypotheticals.  One hypothetical asked the VE to assume that Coleman had the ability to do restricted light work in that he could occasionally lift 20 pounds and sit for 45-minute intervals but must be able to alternate based on diabetes, hypertension, and shooting pain in his right hand, and that he was 51-years-old with a seventh grade education.

The VE testified that based on the hypothetical, there was no relevant work.  (Tr. 827-830).  The vocational expert noted that the 20 pound exertional limit placed Coleman in the light range; however, this level would require Coleman to lift, carry, push, pull, handle, and grasp frequently up to 10 pounds which he was unable to do.  (Tr. 831).  Additionally, he testified that most unskilled light work requires a person to be on their feet continuously for at least a two hour period of time

---

[10]The Commissioner takes "administrative notice of reliable job information" provided in the following publications:"(1) Dictionary of Occupational Titles, published by the Department of Labor; (2) County Business Patterns, published by the Bureau of the Census; (3) Census Reports, also published by the Bureau of the Census; (4) Occupational Outlook Handbook, published by the Bureau of Labor Statistics; (5) Use of vocational experts and other specialists." 20 C.F.R. §§ 404.1566(d), 416.966(d) (2005).

[11]"In reaching judgments as to the sufficiency of the remaining exertional job base ... there are three possible situations to consider: 1. Where it is clear that the additional limitation or restriction has very little effect on the exertional occupational base, the conclusion directed by the appropriate rule in Tables No. 1, 2, or 3 would not be affected.2. Where it is clear that additional limitations or restrictions have significantly eroded the exertional job base set by the exertional limitations alone, the remaining portion of the job base will guide the decision.3. Where the adjudicator does not have a clear understanding of the effects of additional limitations on the job base, the services of a VS will be necessary."  Soc. Sec. R. 83-14 (1983), 1983 WL 31254.

before they could take a break.  (Tr. 831).  He, therefore, opined that the available jobs for Coleman were in the sedentary exertional work category.  (Tr. 831).

The VE further testified that sedentary exertional work at the unskilled level generally required the use of both upper extremities, so that the person could handle, turn, grasp, hold, and seize with both hands.  (Tr. 831).  He also noted that only a small percentage, between 2% to 3%, of the jobs at this level did not require frequent use of both hands.  (Tr. 831).  The VE also concluded, while being questioned by the ALJ, that the information clerk position would not be available to a person like Coleman with a seventh grade education and no prior experience.  (Tr. 832).

The ALJ was not convinced by the level of restriction of the hand so he directed Coleman's counsel to have Dr. Adatto examine Coleman's right  hand.  (Tr. 834).  On January 25, 2005, a second hearing took place.  In between the two hearings, Coleman was examined by consultative examiner, Dr. Gaines, on November 18, 2004.  According to the record, Dr. Adatto did not review and/or examine Coleman's hand.

At the second hearing, the ALJ modified the hypothetical posed to the VE as follows:

There is no past relevant work for 15 years, he is 52-years-old and attended the 7th grade, can read and write, can occasionally life and carry 20 lbs frequently and/or carry 10 lbs, standing or walking 2 hours periodically alternating between sitting or standing every 45 minutes to an hour, with the ability to push or pull on a limited basis in the upper extremity on the right avoiding overhead activities with the right upper extremity consisting of the arm and hand but with no restriction on the left upper extremity permitting gross manipulation occasionally with the right hand and wrist.

(Tr. 848-850)

The vocational expert testified that the weight limitation described by the ALJ is compatible with restricted light work according to the DOT, based upon the standing limitation .  (Tr. 850).  He testified, based upon the hypothetical, that there were jobs available in the economy, some of which

would be sedentary and some that would fall in the light category.  (Tr. 850-A).  The vocational expert concluded that Coleman could perform a security guard surveillance officer position of 8,571 jobs, reduced by 50%.  The vocational expert further testified that there were inspector sampler positions available in both the sedentary and light categories totaling 4,693 which would be reduced by 50% and 505, in the sedentary category, also reduced by 50%.  He also testified that there were parking lot attendant jobs in Louisiana reduced to 331 based upon Coleman's limitations.

Upon questioning by counsel, the vocational expert conceded that  security guard surveillance position consisted of both armed and unarmed guard positions and that the statistics he cited did  not distinguish between them.  (Tr. 851).  The vocational expert found that a person with Coleman's limitations would be able to satisfy the occasional requirement of being able to fire a weapon but the vocational expert reduced the number of positions by 75% instead of the 50%.  (Tr. 852).

As counsel for Coleman questioned the vocational expert about the educational requirements for the light duty security guard job, the ALJ interrupted and indicated that, for argument sake, he would strike all security jobs and directed counsel to move to the next category of jobs.  (Tr. 858).

Counsel then proceeded to question the VE about light cashier jobs.  (Tr. 858).  He testified that a right handed cashier would be required to repetitively use his right hand but the individual could use his left hand.  (Tr. 859).  According to the vocational expert, most low volume cashiering positions are able to accommodate an individual doing work one-handed even with period stocking duties.  (Tr. 864).

The vocational expert was next questioned about the inspector sampler position which may include working on an assembly line.  (Tr. 865).  According to the ALJ, if a person took medication that caused drowsiness and affected the individual's ability to maintain attention or concentration

the person would not be eligible for this type of work.  (Tr. 866).  The ALJ further resolved that the positions of dispatcher and information clerk would be available to a person with the limitations set forth in the hypothetical.

Upon questioning, the VE testified that the information clerk position at the unskilled entry level at the sedentary position had 1,273 to 955 jobs available.  Upon additional questioning about a person with the limitations as described and who takes medication which caused drowsiness and concentration problems, he resolved that the person would not be able to successfully maintain these positions.  (Tr. 871).  Thereafter, counsel in closing argued that, given Coleman's limitations, it was not reasonable for a man to keep a job on a 40-hour work week, five days a week at eight hours a day, with Coleman's limitations.  (Tr. 873).  The ALJ agreed with that conclusion at the hearing. (Tr. 873).

In the opinion, when determining plaintiff's disability status, the ALJ looked to the Medical-Vocational Guidelines grids, specifically Rules 202.17 , Table 2, Appendix 2, Subpart P, Regulations No. 4.[12]  The ALJ did not directly apply the grids to determine plaintiff's non-disability because he found that plaintiff's RFC for work was compromised by non-exertional limitations. Instead, he consulted the grids as a "framework" of reference.

In this instance, however, given the ALJ's acknowledgment that Coleman's ability to perform all or substantially all of the full range of light work was impeded by additional limitations, he was required by statute to rely upon the testimony of the VE.  The first question the undersigned

---

[12]When applicable, Rule 202.17 directs a finding of non-disability for a younger individual whose education is limited or less-at least literate and able to communicate in English, whose previous work experience is unskilled or none. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 2.  A "younger individual" is one whose age is between 18 and 49. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201(h).

must then consider is whether the hypothetical provided by the ALJ to the vocational expert was defective.

The Court finds that the hypothetical posed during the second hearing was defective and further the ALJ was precluded from relying on the grid because of the non-exertional limitations. As a result, the ALJ's decision was not based upon substantial evidence under the applicable standards.

The Fifth Circuit Court has held that a hypothetical question posed to the vocational expert by the ALJ must reasonably incorporate "all disabilities of the claimant recognized by the ALJ," and the claimant or his representative must be "afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions." *Bowling v. Shalala,* 36 F.3d 431, 436 (5th Cir. 1994). If this is not the case, "a determination of non-disability based on such a defective question cannot stand." Furthermore, responses of the VE are relevant only to the extent offered in response to hypotheticals corresponding to medical evidence of record. *See e.g., Arocho v. Sec. of Health & Human Servs.,* 670 F.2d 374, 375 (1st Cir. 1982).

During the second hearing the ALJ used the wrong age when submitting the inquiry to the vocational expert. He mentioned that the claimant was 52-years-old, when the determination should have been made as of July 1997 when the claimant was 44-years-old. (Tr. 848). Second, the medical records show that, as of October 2004, Coleman was prescribed steroid injections and

Vicodin[13], Elavil[14] and Flexeril[15] to treat his pain complaints. (Tr. 601). Dr. Gaines, the consulting physician, diagnosed Coleman with lumbago, which means recurring pain in the lower lumbar region of the back.[16]

Additionally, the ALJ failed to include the limitation of a frozen shoulder or adhesive capsulitis/rotator cuff tendinitis. Dr. Gaines diagnosed Coleman with a frozen right shoulder which may have impacted his functional capacity. (Tr. 762). The hypothetical also made no reference to the non-exertional limitation of pain , which Dr. Gaines confirmed on the diagnosis of lumbago, nor the diagnosis of  adhesive capsulitis. The Court notes that Coleman's employability was largely restricted by at least 50% without reference to these additional  factors.

Because the ALJ failed to submit a factually accurate or complete hypothetical, with all of the limitations, the Court finds that his opinion is not based on substantial evidence. Furthermore, while the ALJ states that he used the grid as a reference, he was precluded from relying on the grid exclusively in light of Coleman's non-exertional limitations.

The final question for the court to consider is whether to again remand for further proceedings consistent with this opinion, or whether Coleman, as he requests, is entitled to benefits as a matter of law. In this respect, if a record does not contain substantial evidence supporting the

---

[13]Vicodin is used for the treatment of moderate to moderately severe pain. It may also be used for other conditions as determined by your doctor.  Vicodin is an analgesic combination. Acetaminophen works by lowering a chemical in the brain that stimulates pain nerves. Hydrocodone, an opioid (narcotic) analgesic, works by binding to receptors in the brain and nervous system used by the body's natural "pain relievers." http://www.drugs.com/cdi/vicodin.html.

[14]Elavil is the brand name for amitriptyline, which is used to elevate the mood of patients with depression. http://www.medicinenet.com/amitriptyline/article.htm.

[15]Flexeril is the brand name for cyclobenzaprine, which is used together with rest and physical therapy for short-term relief of painful muscle conditions. It is only for short-term use, up to 2 to 3 weeks. http://www.medicinenet.com/cyclobenzaprine/article.htm.

[16]http://www.dictionary.refence.com/lumbago.

denial of benefits and if reopening the record could not support a finding of no disability in any event, an award of benefits rather than remand for a rehearing is appropriate. *Coffman v. Bowen,* 829 F.2d 514, 519 (4th Cir. 1987). Contrary to Coleman's contention, the record does not indisputably support his claim for benefits, so he is not entitled to summary judgment awarding benefits outright.

Because essential factual issues remain to be resolved, the matter will be remanded to the Commissioner for a determination of whether there is medical improvement, and if so, whether Coleman can return to the duties of his past relevant work or other work. If it is necessary to apply the Medical Vocational Guidelines as a directive or as a framework, the Commissioner is directed to apply the proper guideline.

## IV.   <u>Recommendation</u>

**IT IS THEREFORE RECOMMENDED** that Coleman's **Motion for Summary Judgment (Rec. Doc. No. 13)** be **GRANTED in part** and **DENIED in part** in the following manner:

The motion should be **GRANTED** to the extent that the ALJ's decision was not based upon substantial evidence under the appropriate legal standard and the decision denying or discontinuing disability insurance benefits should be **REVERSED**; and

The motion should be **DENIED** to the extent that it seeks an order awarding disability benefits.

**IT IS FURTHER RECOMMENDED** that the matter be **REMANDED** to a **different** administrative law judge for a determination based upon the evidence:

1.   The new ALJ is directed to hold a rehearing and reassess the plaintiff's residual functional capacity; and

2.   Additionally, the new ALJ shall obtain information and determine the impact of the plaintiff's limitations on the available occupational base.

It is further **RECOMMENDED** that the **Defendant's Cross-Motion for Summary Judgment (Rec. Doc. No. 14)** filed by the Commissioner be **DENIED**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within ten (10) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996)

New Orleans, Louisiana, this 12th  day of September, 2008.

_____

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**